UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:

MICHAEL CHANCE TATE                                    CASE NO. 20-10163
    DEBTOR                                             CHAPTER 7

**MEMORANDUM OPINION**

Christopher Dwyer moved to dismiss debtor Michael Chance Tate's ("Tate" or "Debtor") chapter 7 bankruptcy under 11 U.S.C. § 707(b), or alternatively, to convert it to a chapter 13 case.[1] Dwyer's reply brief[2] later alleged in further alternative that Tate's case should be dismissed as an abusive filing under 11 U.S.C. § 707(a). Tate opposes all relief Dwyer seeks.[3]

This memorandum opinion explains why Dwyer's motion is denied.[4]

**I. Findings of Fact**

Dwyer and Debtor first met in grade school. Years later Dwyer, acting as his own general contractor, decided to build a home and approached Tate, whom he knew performed HVAC work, to submit a bid for the undertaking. Dwyer then orally contracted with Tate's business, Chance's HVAC, LLC ("Chance's"), to design and install a heating and air conditioning

---

[1] Motion to Dismiss Case for Abuse [P-18] and Memorandum in Support [P-20]. Dwyer's counsel conceded before trial, and again at trial, that conversion to chapter 13 may be ordered only with a debtor's consent. *See* 11 U.S.C. § 707(b)(1). Tate has not consented to conversion.

[2] Dwyer's Reply to Tate's Objection to the Motion to Dismiss [P-26].

[3] Debtor's Response in Opposition to Motion to Dismiss Case [P-23]; Debtor's Post-trial Memorandum [P-39].

[4] This memorandum opinion comprises findings of facts and conclusions of law as required by Fed. R. Civ. P. 52, made applicable by Fed. R. Bankr. P. 9014 and 7052. All the parties' arguments have been considered, including any this opinion does not specifically address.

system.[5] Dwyer paid cash for the work[6] that Chance's invoiced on its letterhead.[7] Throughout the time Chance's and Dwyer did business, Chance's did not hold a valid Louisiana contractor's license.[8] Chance's also apparently lacked some insurance coverage that Dwyer believed it should have, though no evidence supported a finding that their agreement required Chance to maintain insurance.[9]

Tate did not complete the project before leaving to take employment out of state. Before leaving Louisiana, however, Tate introduced Dwyer to another HVAC installer, Evans, suggesting that Evan would finish his work, which Tate testified was ninety percent complete. But Evans later declined to finish the undertaking and introduced Dwyer to Sagely's Home Maintenance ("Sagely's"). Dwyer engaged Sagely's to finish the job even though the company, like Chance's, was unlicensed.

Christopher and Alicia Dwyer eventually sued Chance's for failing to complete the contracted work, taking money for equipment without paying the equipment vendor, installing a water heater different from the model Dwyer had ordered, and for defective workmanship.[10] The state court petition names only Chance's as a defendant.

---

[5] Tate introduced largely illegible HVAC plans [Tate Exhibit 2].

[6] Dwyer paid Chance's cash in the following amounts: $14,880 on January 10, 2019; $3,250 on January 10, 2019; and $10,000 on March 13, 2019 [Dwyer Exhibit, 2A, 2B, and 2C].

[7] The invoices are attached to Dwyer Exhibit 2, Dwyer's state court petition against Chance's. *See* note 6.

[8] June 23, 2020 letter from State of Louisiana Licensing Board for Contractors [Dwyer Exhibit 5].

[9] No evidence established the types of insurance that Dwyer believed Chance's was obligated to carry, and in any event, Tate did not dispute Dwyer's testimony that Chance's worker's compensation insurance expired or was cancelled before the company undertook the work. Nor did the evidence suggest that Dwyer suffered any loss as a result of Chance's failure to provide insurance coverage.

[10] *Dwyer v. Chance's HVAC, LLC,* case no. 23718, Twentieth Judicial District Court, State of Louisiana [Dwyer Exhibit 2].

Tate filed chapter 7 on February 3, 2020.[11]  Dwyer has moved to dismiss the bankruptcy,[12] alleging that Tate:

1) Committed "contractor fraud" by misrepresenting to Dwyer that Chance's held a contractor's license and insurance;

2) Had no intention of performing the agreed work, instead converting what Dwyer paid for the work to his own use rather than paying the equipment vendor;

3) Substituted lesser quality equipment than Dwyer had agreed on; and

4) Mischaracterized his debt to Dwyer as business debt because Debtor was no longer operating a business when he filed chapter 7.

Tate denies Dwyer's allegations.[13]

## II. Law and Analysis

### A. Section 707(b)

Section 707(b)(1) empowers a court to dismiss a case filed by an individual chapter 7 debtor whose debts are primarily consumer debts on a finding that granting relief to the debtor would be an abuse.  "As such, § 707(b) only permits the dismissal of a case filed by an individual debtor whose debts are primarily consumer."[14]

---

[11] Dwyer received notice of the bankruptcy filing and of the May 26, 2020 deadline for filing complaints contesting dischargeability under Bankruptcy Code section 523 and discharge under section 727.  BNC Certificate of Mailing of Notice of Chapter 7 Bankruptcy Case, Official Form 309A [P-10].

[12] Dwyer did not object to Tate's discharge or the dischargeability of his claim against Tate, for reasons not in evidence.  Dwyer has not claimed lack of notice of the deadline to object to discharge and dischargeability, which the record reflects was served on him by United States Mail [P-10]. *See* note 11.

[13] Dwyer has not proven a claim against Tate individually. Although for reasons the record does not make plain, Tate has not used Chance's limited liability company status as a defense to Dwyer's allegations.  Indeed, both parties use Chance's and Tate interchangeably.  For example, Tate's post-trial memorandum recites that Dwyer "hired Debtor and/or Debtor's HVAC business" [Debtor's post-trial memorandum, P-39].

[14] *In re Rucker*, 610 B.R. 570 (Bankr. N.D. Tex. 2019) (citing *Matter of Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988)).

Tate's original chapter 7 petition failed to indicate whether his debts were primarily consumer or business,[15] as Official Form 10 requires. That omission was not insignificant. Section 707(b) provides for dismissal of a chapter 7 case filed by an individual debtor with primarily consumer debts if granting relief would be an abuse of chapter 7.[16] If the debtor does not have primarily consumer debts, and instead has primarily business debts, section 707(b) is inapplicable.

Tate responded to Dwyer's original motion to dismiss by filing an amended petition claiming that his debts are not primarily consumer but instead are primarily business.[17] That amendment mooted the original motion. Dwyer then pivoted[18] to argue that even if the Debtor's obligations were not primarily consumer debts, the bankruptcy filing was itself abusive under Bankruptcy Code section 707(a) and so should be ended.

Bankruptcy Code section 101(8) defines *consumer debt* as a "debt incurred by an individual primarily for a personal, family, or household purpose." "The term 'primarily' indicates that all of the debts need not be consumer debts but that consumer debts must be a substantial component of the indebtedness."[19] "'[P]rimarily' suggests an overall ratio of consumer to nonconsumer debts of over fifty percent."[20]

---

[15] Voluntary Petition [P-1, p. 6].

[16] Section 707(b) is "applicable only to debtors whose debts are primarily consumer debts." 6 COLLIER ON BANKRUPTCY ¶ 707.04[1] (16th ed. 2020). Individual chapter 7 debtors with primarily consumer debts must complete a means test calculation. If the means test result shows that that the debtor's disposable income exceeds a certain "threshold," the petition is presumptively abusive. *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 131 S.Ct. 716 (2011).

[17] Amended Voluntary Petition [P-28].

[18] Dwyer's Reply to Tate's Objection to the Motion to Dismiss [P-26].

[19] 6 COLLIER ON BANKRUPTCY ¶ 707.04[2][d] (16th ed. 2020).

[20] *Booth*, 858 F.2d at 1055.

One seeking dismissal under section 707(b) bears the burden of proving that the debtor's debts are primarily consumer rather than business,[21] applying a fairly straightforward test: "[W]hether a debt should be classified as a business debt … [depends on] whether it was incurred with an eye toward profit."[22]

> In evaluating whether a profit motive exists, the purpose for incurring the debt is determined at the time the debt was incurred, and any subsequent recharacterization of the debt is inconsequential. A court should determine the true purpose for incurring the debt in light of the entire transaction.[23]

The Debtor's schedules list $142,842.45 in debt, with $126,132.52 labeled as "Business Debt":

$32,008.68 to Acme;

$2,274 to Affirm Inc.;

$12,754 to Amex;

$943.89 to Capital One;

$57,330 to Chris Dwyer;[24]

$186.13 to Citi Cards;

$796 to Credit One Bank, NA;

$10,835.98 to Discover;

$825.86 to Genesis Bc/Celtic Bank;

---

[21] *Rucker*, 610 B.R. at 579; *In re Fedoruk*, 605 B.R. 444, 451 (Bankr. S.D. Tex. 2019) (citing *In re Chohev*, 559 B.R. 339, 342 (Bankr. E.D.N.Y. 2016); *In re Aiello*, 428 B.R. 296, 299 (Bankr. E.D.N.Y. 2010)).

[22] *Booth*, 858 F.2d at 1055.

[23] *Rucker*, 610 B.R. at 576 (citing *In re Martin*, No. 12-38024, 2013 WL 5423954, at *6 (Bankr. S.D. Tex. Sept. 26, 2013); *Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457, 462 (5th Cir. 1999)).

[24] Apparently assuming his claim is consumer debt, Dwyer argues that Tate's liability to him is "substantially more … and constitutes more than half of the debt." [Dwyer's reply, P-26, p. 4.]

   $376.24 to Graceland Rental;

   $5,283.71 to JPMBC Card Services; and

   $2,518.03 to PayPal Credit/Syncb.

Dwyer hired Debtor's business Chance's for HVAC work, a business undertaking "with an eye toward profit."[25] Tate's debt to Acme for equipment to conduct his HVAC trade undoubtedly was business and not consumer debt.[26] Thus, at least $95,104.68 of $142,842.45—well more than half—of Debtor's liabilities are not consumer debts.

Dwyer maintains that these debts cannot be considered Tate's business debts because Chance's was not a licensed business. But he cites no statutory authority or jurisprudence to support his contention.

Because Debtor's debts are not primarily consumer debts, dismissal under section 707(b) is not warranted.

**B. Section 707(a)[27]**

Section 707(a) empowers the court to dismiss a chapter 7 case "for cause," including:

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 28; and

---

[25] Dwyer cites *In re Durant*, 586 B.R. 212 (Bankr. D. Md. 2018) to support his contention that actual damages are consumer debt; but *Durant* does not support that proposition. The *Durant* debtor had controlled a creditor's inheritance prepetition while the creditor was a minor. When the creditor reached majority and learned from the debtor that most of the inheritance had been dissipated, he sued for breach of fiduciary duty, fraud, theft, conversion and unjust enrichment. After failing to respond to the lawsuit and suffering judgment by default, the debtor filed chapter 7. The United States Trustee then moved for dismissal under section 707(b). The bankruptcy court found that the debtor had spent the creditor's inheritance for primarily consumer purposes and therefore concluded that the state court damages award was consumer debt. *Id.* at 220 and 222-223.

[26] Ms. Aucoin, Acme's representative, testified that Debtor owed Acme for HVAC equipment and supplies.

[27] Dwyer did not initially seek dismissal under Bankruptcy Code section 707(a), raising the issue for the first time in his reply brief [P-26]. When the Debtor complained of surprise, the evidentiary hearing was continued to allow him to prepare to meet the newly added allegations.

> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on motion by the United States Trustee.[28]

But that sparse list does not define the universe of reasons a court may dismiss a chapter 7. Congress used *including* in the statute to expand the list of reasons a bankruptcy court might decide to end a case.[29] Thus, courts including the Fifth Circuit have held that section 707(a)'s enumerated causes for dismissal "are illustrative, not exhaustive."[30] The Fifth Circuit holds:

> "Cause" is a broad concept, designed to "afford flexibility to the bankruptcy courts." This flexibility derives from bankruptcy's equitable roots. True to equity's flexibility, we have instructed courts to "weigh the benefits and prejudices" of dismissal—to the debtor, creditors, and the bankruptcy system—when deciding a § 707(a) motion.[31]

"[C]ause is any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process."[32] "In judging whether there is cause to dismiss a case, a court may consider the debtor's entire course of conduct—before, during, and after the

---

[28] 11 U.S.C. §707(a).

[29] The Bankruptcy Code provides that "'include' and 'including' are not limiting." 11 U.S.C. §102(3).

[30] *Kelley v. Cypress Fin. Trading Co., L.P. (In re Cypress Fin. Trading Co., L.P.),* 620 F. App'x 287, 289, 2015 U.S. App. LEXIS 14347, *4-5 (5th Cir. 2015).

[31] *Id.* (citing *Little Creek Development Co. v. Commonwealth Mortgage Corp. (Little Creek Dev. Co.),* 779 F.2d 1068, 1072-73 (5th Cir.1986); *Peterson v. Atlas Supply Corp. (Matter of Atlas Supply Corp.),* 857 F.2d 1061, 1063-64 (5th Cir. 1988)). *See also Krueger v. Torres (In re Krueger),* 812 F.3d 365, 375 (5th Cir. 2016) (Bankruptcy courts must "weigh[ ] the costs of dismissal to creditors and [the ability] to mitigate them through appropriate orders.")

[32] *Krueger*, 812 F.3d at 370 (citing *Little Creek*, 779 F.2d at 1072.).

filing of the chapter 7 petition."[33] The Fifth Circuit held in *In re Krueger*[34] that bad faith can be cause for dismissal.[35]

> Requirement of good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way to achieve reprehensible purposes.[36]

Dwyer points to *In re Peterson*[37] for a list of factors to be applied when considering requests for involuntary dismissal. But Fifth Circuit law controls the outcome here, and its jurisprudence suggests that only more egregious actions will support a bankruptcy court's use of section 707(a) to end a debtor's case.[38] For example, in *In re Krueger,*[39] the debtor 1) admitted that he filed bankruptcy to avoid a criminal contempt proceeding and to gain a new venue; 2) used a false address on his bankruptcy petition to avoid service; 3) failed to list in his schedule

---

[33] *Krueger*, 812 F.3d at 372.

[34] *Krueger,* 812 F.3d at 365.

[35] *Krueger*, 812 F.3d at 370 (citing *Little Creek,* 779 F.2d at 1071).

[36] *Little Creek,* 779 F.2d at 1072.

[37] *In re Peterson*, 524 B.R. 808 (Bankr. S.D. Ind. 2015). The *Peterson* court considered five factors in determining whether *cause* existed to dismiss under section 707(a):

> (1) whether the debtor has the present ability to pay his debts if he chooses; (2) whether the debtor has manipulated the bankruptcy process to frustrate one particular creditor; (3) the absence of any attempt to pay creditors; (4) whether the debtor is willing to make lifestyle changes to pay his debts; (5) whether the debtor is acting in good faith; (6) whether there is another proceeding through which the payment of claims can be handled….

*Id.* at 814.

[38] *See, e.g., Krueger,* 812 F.3d 365 (finding bad faith supporting dismissal when the debtor "engaged in conduct designed to manipulate the proceedings to his own ends, including false filings, false testimony, and witness intimidation."); *In re Schwartz*, 799 F.3d 760 (7th Cir. 2015) (finding cause to dismiss where debtor depleted assets prior to filing chapter 7); *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253 (11th Cir. 2013) (finding that debtor's purpose was to discharge a single debt while making payments to insiders); *cf. Peterson v. Atlas Supply Corp. (Matter of Atlas Supply Corp.),* 857 F.2d 1061 (5th Cir. 1988) (finding no cause to dismiss based on lack of corporate authorization when mover acquiesced by failing to object for over a year and dismissal would prejudice creditors).

[39] *Krueger,* 812 F.3d 365.

of assets his interest in a newly formed company at the very time he was seeking to raise capital for the new company; 4) convened and voted in a shareholder meeting, even though his shares in the company were property of the bankruptcy estate controlled by the trustee; 5) threatened a witness at the bankruptcy court's hearing on the motion to dismiss under section 707(a).

The Fifth Circuit held that the debtor's actions "formed a concerted scheme to use the bankruptcy process as both a shield from legitimate state court actions and a sword to retake control" of his company.[40]  It found a record "replete with evidence that [the debtor] filed bankruptcy for illegitimate purposes, misled the court and other parties, and engaged in bare-knuckle litigation practices, including lying under oath and threatening witnesses."[41]

The evidence here paints a picture far different from that in *Krueger*.

First, Dwyer contends that Tate intentionally defrauded him by misrepresenting that Chance's was licensed and insured.  Tate, on other hand, maintains that Dwyer never asked if Chance's was licensed and denies ever telling him that it was licensed.  No evidence established that Dwyer suffered any loss because Chance's lacked insurance or a license: indeed, Dwyer hired Sagely's, another unlicensed contractor, to finish the work about which it complains.

The arrangement between Tate and Chance's came about initially because Tate and Dwyer were childhood friends.  Neither party protected themselves with a written contract, and the facts support an inference that by paying cash, Dwyer hoped to have the HVAC work completed at lower price through his acquaintance's business.  In any event, the evidence was insufficient to support a finding that Chance's lapsed license and insurance truly mattered to

---

[40] *Krueger*, 812 F.3d at 374.

[41] *Krueger*, 812 F.3d at 374.

Dwyer. Had they been so significant, Dwyer would not have resorted to another unlicensed contractor, Sagely's, to complete the HVAC work on his new home.

Nor did the evidence suggest that Tate deceived Dwyer by undertaking the work without the intent to complete it. Tate introduced Dwyer to Evans to complete the work when Tate was planning on leaving town. That suggests Tate was not trying to conceal anything from Dwyer and wanted the project completed as agreed.[42] Failure to finish the work may have breached the parties' agreement but the facts are not so egregious as to support ending Tate's bankruptcy on that account.

Nor did the trial evidence support Dwyer's allegation that Debtor had not paid the supplier for equipment it had ordered for Dwyer's house and instead converted the funds. Rather, it proved exactly otherwise.

Kay Aucoin is the credit manager of Acme Refrigeration, LLC ("Acme"), which sold Chance's the HVAC materials it used on Dwyer's project. Ms. Aucoin testified that Acme required Chance's to pay "up front" for equipment: Acme would not extend Chance's credit when Chance's was working for Dwyer so Chance's arranged to pay Acme in advance for any materials to be used at the Dwyer house.

Dwyer paid Chance's cash totaling $28,130: $14,880 on January 10, 2019;[43] $3,250 on January 10, 2019;[44] and $10,000 on March 13, 2019.[45] Evidence at trial established that of the

---

[42] Evans later reneged on his tentative agreement to take the job and introduced Dwyer to Sagely's.

[43] Chance's invoice no. SHW1777610-368162 reflects that Dwyer paid $14,880 in cash on January 10, 2019 against a total amount due of $17,043, leaving a balance due of $2,163.08 [Dwyer Exhibit 2A].

[44] Chance's invoice no. SHW1777610-368161 reflects that Dwyer paid the total amount due of $3,250 in cash on January 10, 2019 [Dwyer Exhibit 2B].

[45] Chance's invoice no. SHW1777610-368172 reflects that Dwyer paid the total amount due of $10,000 in cash on March 13, 2019 [Dwyer Exhibit 2C].

$28,130 Dwyer paid to Chance's, Chance's spent $25,538.66 on equipment.[46] Testimony supports a finding that Chance's incurred labor costs that account for the remaining $2,591.34.[47]

Tate and Dwyer disagree on the percentage of work Chance's completed;[48] but at a minimum, Chance's delivered equipment to the job site, installed water heaters, duct work, air registers and line sets;[49] and built a platform for the air handlers. Tate testified that he worked at Dwyer's house over twelve times between February and March 2019,[50] testimony Dwyer did not rebut.

Dwyer also did not establish that Tate installed lesser quality equipment than Dwyer specified for the project. Rather, Tate admitted installing a water heater made by a company other than that Dwyer specified for the job but testified that it was of a better quality than the equipment Dwyer wanted. Tate also testified that Dwyer knew of the change in water heater brand upon delivery and before Chance's installed it. Dwyer failed to rebut Tate's testimony on these points.

Ms. Aucoin's testimony that Tate owed money to Acme prior to his purchasing equipment to use at Dwyer's house supports a finding that Tate's financial troubles predated

---

[46] Tate Exhibit 3 shows that Tate paid $17,183.43 for equipment, and Dwyer Exhibit 6 shows another $8,355.23 in paid invoices. These amounts do not include the March 4, 2019 quote for $13,482.75 and any invoices that do not reflect that they were paid.

[47] Chance's paid $14,000 for labor on the project, according to Tate's testimony, which Dwyer did not rebut [Tate Exhibit 3]. Dwyer did not allege that he paid Chance's for any labor.

[48] Tate testified that the job was 85% to 90% complete when he left. Though Dwyer disagreed that the work had progressed that far, he did not specify a percentage of completion.

[49] Testimony established that the duct work was designed to accommodate a Rheem gas system. Dwyer later decided that he wanted to install a Mitsubishi heat pump, knowing that the unit would be more expensive and that the change would require redoing duct work. Dwyer's decision to use spray foam insulation rather than traditional insulation also required changes to the original plan for the work.

[50] Tate introduced illegible copies of GPS records to show that he was at Dwyer's house [Tate Exhibit 1], which received no weight in the analysis of the evidence.

Dwyer's suit against Chance's. Tate's schedules also show large credit card debts to American Express and Discover.[51] Although Dwyer holds the largest unsecured claim,[52] even without the debt to Dwyer, Tate would be deeply in debt. The evidence does not suggest that this Debtor is abusing the bankruptcy process solely to frustrate Dwyer, much less engaging in a "concerted scheme of bankruptcy abuse."[53]

Finally, Dwyer contends that Tate's performing the work at his home without a license constitutes criminal residential contractor fraud under La. R.S. 14:202 and 14:202.1 and cause for dismissal under section 707(a). But section 707(c)(2) allows discretionary dismissal only where a debtor has been convicted or a violent crime or drug trafficking offenses.

> Except as provided in paragraph (3), after notice and a hearing, the court, on a motion of a crime of violence or a drug trafficking crime, may when it is in the best interest of the victim dismiss a voluntary case filed under this chapter by a debtor who is an individual if such individual was convicted of such crime.

Dwyer did not allege much less prove that Tate had been convicted of, or even charged with, a violent or drug trafficking crime.[54] Congress chose not to include other crimes as a basis for dismissing a chapter 7 case. Its omission is telling. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally

---

[51] Debtor's Schedule E/F shows $131,481.45 in unsecured debt, including $12,754 to "Amex" and $10,835.98 to Discover [P-2].

[52] Debtor scheduled Dwyer as holding a $57,330 unsecured claim.

[53] *See Krueger*, 812 F.3d at 366 (finding bad faith supporting dismissal when the debtor "engaged in conduct designed to manipulate the proceedings to his own ends, including false filings, false testimony, and witness intimidation.").

[54] Although La. R.S. 14:202 and 14:202.1 *may* have supported nondischargeability of Tate's debt to Dwyer under section 523(a) had Dwyer filed a timely complaint, Dwyer is now seeking a much harsher result: the dismissal of Tate's case. Dismissal would deny Tate a discharge of not only his debt to Dwyer but his debt to all other creditors holding dischargeable claims. Thus, an analogy to denial of discharge under section 727(a), rather than dischargeability under section 523(a), is appropriate. No evidence supports a finding or conclusion that Tate's actions would merit denial of his discharge.

presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[55]

### III. CONCLUSION

All debtors file bankruptcy because they cannot pay creditors. Many of those debtors enter bankruptcy once creditors initiate state court proceedings against them. Tate's situation is typical of contractor cases. The evidence established a contract dispute, rather than Debtor's bad faith. Dwyer has not proven that Tate filed bankruptcy for illegitimate purposes, misled the court, or did anything else to abuse the bankruptcy process or amounting to *cause* for involuntary dismissal under section 707(a).

Dwyer's motion to dismiss or, in the alternative, to convert to chapter 13, is denied.

Baton Rouge, Louisiana, October 20, 2020.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

---

[55] *Kucana v. Holder*, 558 U.S. 233, 249, 130 S.Ct. 827, 838 (2010) (quoting *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 1759 (2009)).